UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. _____

| | |
|---|---|
| In re Application of<br><br>FRASERS GROUP PLC,<br><br>               Applicant,<br><br>Pursuant to 28 U.S.C. § 1782<br>for Judicial Assistance in Obtaining<br>Evidence for Use in a Foreign and<br>International Proceeding. | |

**APPLICATION FOR JUDICIAL ASSISTANCE
PURSUANT TO 28 U.S.C. § 1782**

FRASERS GROUP PLC ("Frasers"), respectfully submits this Application for Judicial Assistance Pursuant to 28 U.S.C. § 1782, in obtaining documentary and testimonial evidence for use in a foreign proceeding (the "Application") pending in England, as more specifically set forth below. In support, Applicant respectfully states as follows:

**FACTUAL BACKGROUND**

1.      The facts relevant to this Application are set forth below and in the accompanying Declaration of Simon David Hart (the "Declaration"). The facts stated in the Declaration are incorporated herein by reference.

2.      The Applicant seeks assistance from the United States District Court for the Southern District of New York to obtain documentary evidence from James Patrick Gorman (the "Discovery Target"), who resides in this District. Decl. at ¶¶ 6, 35.

-1-

## Relevant Parties

3.      Applicant, Frasers Group PLC ("Frasers"), is a British retailer group listed on the FTSE-100 (but majority owned by its founder, Mike Ashley). Decl. at ¶ 8.

4.      James Patrick Gorman (the "Discovery Target") is Chairman and CEO of Morgan Stanley. Gorman, the Discovery Target, resides and is found within the Southern District of New York. Decl. at ¶ 6.[1]

5.      Morgan Stanley is an investment bank and financial services company headquartered at 1585 Broadway in New York, NY. Decl. at ¶ 9. Morgan Stanley & Co International PLC is a defendant in the English proceeding that is the foreign proceeding for which the Applicant seeks assistance. Decl. at ¶ 3. Morgan Stanley is not the target of the discovery sought in this application.

## Basis for the Proceedings and Relevance of the Requested Discovery

6.      Applicant seeks assistance from the United States District Court for the Southern District of New York to obtain testimonial and documentary evidence from the Discovery Target, who resides or is found in this District. Decl. at ¶ 6. Specifically, Applicant seeks evidence to support its pending civil claims filed on June 28, 2021, in the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (the "English Proceeding").

7.      At the time of filing the English Proceeding, there were two defendants: Morgan Stanley and Saxo Bank A/S ("Saxo Bank").  Decl. at ¶ 3. Since that time, the claim against Saxo Bank A/S has been discontinued by the Claimant following a confidential settlement with Saxo Bank A/S. *Id.* The claim against Morgan Stanley is ongoing: the parties have conducted

---

[1] *See, e.g.*, https://www.searchpeoplefree.com/find/james-p-gorman/17d23FsbQeze (last visited September 19, 2023).

discovery under the applicable English rules of procedure, exchanged witness evidence, and a trial on the merits has been listed for 10 days beginning in February 2024. *Id.* This application is thus time sensitive because it is crucial that the evidence sought is obtained and reviewed in time for it to be used at the trial. Decl. at ¶ 27.

8.      Applicant's claims in the English Proceeding arise from a highly unusual US$995 million margin call that Morgan Stanley improperly imposed on Saxo Bank (and passed on to Frasers) in relation to certain options held by Frasers. Decl. at ¶ 9. Saxo Bank acted as London agent for the trades of these options. *Id.*

9.      Morgan Stanley is a part of the global Morgan Stanley investment banking group (which also includes Morgan Stanley Europe SE, a German bank which provided prime brokerage services to Saxo Bank). Decl. at ¶ 9.

10.      Beginning in 2019, Applicant began to build a stake in the fashion company Hugo Boss ("Boss"). Decl. at ¶ 11. One of the ways Applicant built up and managed its ownership stake was by entering into derivatives trades (put and call options in respect to Boss shares) with Saxo Bank. *Id.* Having originally sold Boss put options, from mid-April 2021 and into May 2021, Applicant sold an increasing number of Boss call options ("the Calls"). *Id.* During the entire options period during which it sold the Calls, Applicant ensured that the Boss shares it owned outright were sufficient to cover the Calls. *Id.* In other words, the number of Boss shares in Saxo Bank's custody account, over which Saxo Bank had security and a pledge (the "Custody Shares"), exceeded the number of Boss shares that Applicant would have had to transfer if the Calls were exercised by their purchasers. *Id.* This entirely negated the risk that Frasers might need to obtain shares from the market in the event that any or all the Calls were exercised. *Id.*

11.     Because of this risk mitigation strategy, Saxo Bank assured Applicant that it would not be required to provide any margin (i.e., additional collateral) beyond its custody shares in respect of these covered call options. Decl. at ¶ 12. Saxo Bank explicitly confirmed this on multiple occasions before May 26, 2021, and Saxo Bank did not demand payment of any margin for the Calls. *Id.*

12.     Without Applicant's knowledge, Saxo Bank had entered into back-to-back trades with Morgan Stanley in relation to the Calls because Morgan Stanley, as a market-leading prime broker, was a member of the underlying stock exchange, Eurex. Decl. at ¶ 13. Morgan Stanley did not require any margin from Saxo Bank with respect to the Calls beyond the de minimis "exchange margin" which Morgan Stanley was required to post with Eurex (and which Saxo Bank did not pass on to Applicant). *Id.*

13.     Before the margin call, Applicant had also been in direct discussions with Morgan Stanley about the possibility of opening a commercial banking relationship. Decl. at ¶ 10.

14.     On or about May 25, 2021, Morgan Stanley made a US$995 million margin call on Saxo Bank in relation to the Calls (the "Margin Call"). Decl. at ¶ 14. Saxo Bank paid US$400 million on or around May 26, 2021, in part satisfaction of the Margin Call. *Id.* On May 26, 2021, Saxo Bank purported to issue a cash only margin call to Applicant for US$900 million in respect to the Calls with an obligation to pay "immediately" (the "Passed-On Margin Call").

15.     At the time, the Calls had a total value of EUR 217,572,000 (*i.e.*, strike price multiplied by the number of shares), meaning the Margin Call implied a fear that Boss's share price might increase by more than 400% from the strike price. Decl. at ¶ 15. Morgan Stanley has argued in the English Proceeding that its decision to impose the Margin Call was "based on objective indications of risk" and that it was calculated by applying the "Jump to Health Stress

Test" in accordance with Morgan Stanley's standard practices. *Id.* In fact, as Applicant has argued in the English Proceeding, the decision to impose the Margin Call was arbitrary, capricious, in breach of good faith, far from market practice, and a breach of contract. *Id.*

16.     Applicant engaged in negotiations with Saxo Bank and Morgan Stanley in an effort to avoid a forced close out of the Calls. Decl. at ¶ 16. The negotiations were ultimately unsuccessful, despite Applicant's offer to pledge the Custody Shares to Morgan Stanley that would have entirely removed any conceivable credit risk. *Id.*

17.     Following the breakdown of negotiations, Applicant obtained injunctions against both Morgan Stanley and Saxo Bank on Friday June 11, 2021, to prevent the execution of the Margin Call and the Passed-On Margin Call, thereby preventing the threatened close out of the positions. *Id.* In conjunction with obtaining the injunctions, Applicant arranged to transfer the positions from Morgan Stanley to other brokers. *Id.*

18.     Applicant lost approximately EUR 50 million from Morgan Stanley's outrageous actions. Decl. at ¶ 17. In particular, Applicant incurred significant costs when transferring the positions away from Saxo Bank and Morgan Stanley and suffered further damages from its resultant inability to enter into further such options trades in light of the events described above. *Id.*

19.     Applicant alleges in the English Proceeding that Morgan Stanley knew, or was recklessly indifferent to, the fact that the Passed-On Margin Call, and maintenance of the same, was in breach of the Saxo Bank Contract, thus raising claims under English law for the torts of inducing breach of contract and causing loss by unlawful means. Decl. at ¶ 18. Applicant further or alternatively alleges that certain individuals at Morgan Stanley joined in a conspiracy to cause loss to Applicant by unlawful means in the imposition and maintenance of the Margin Call. *Id.*

20.     It now appears that part of the explanation for Morgan Stanley's actions lies in the fallout from the Archegos collapse. Decl. at ¶ 19.

21.     Archegos Capital Management ("Archegos") was an over-leveraged limited partnership family office that had built up various concentrated single-stock positions. Decl. at ¶ 20. During March 2021—about two months before the Margin Call at issue—Archegos defaulted on margin calls from several global investment banks, including Morgan Stanley. Decl. at ¶ 19.[2] Morgan Stanley's prime brokerage business lost approximately US$1 billion in March 2021 from Archegos's default and eventual collapse. Decl. at ¶ 20.

22.     Morgan Stanley appears to have concluded that one of the primary risk factors that led to the Archegos loss was that the latter was a family office, *i.e.*, a privately held company that manages investments on behalf of a wealthy individual or individuals. Decl. at ¶ 20. Although it is a publicly listed company, Applicant is sometimes incorrectly viewed as a family office type arrangement because it has a majority shareholder. *Id.* On information and belief, some Morgan Stanley employees improperly viewed Applicant as a family office, and when, in the wake of the Archegos debacle, Morgan Stanley reevaluated the large, single-stock position that Applicant had built up in Boss, they mistakenly assessed that position on the basis that it was held by a family office similar to Archegos, when it was not. *Id.*

23.     On April 16, 2021, a month after the Archegos collapse and a month before the Margin Call, the Discovery Target explained during Morgan Stanley's first quarter 2021 investor call that Morgan Stanley had lost USD 911 million due to the collapse of Archegos. Decl. at ¶ 21. Nevertheless, he sought to assure the markets that Morgan Stanley's prime brokerage

---

[2] Several of Archegos's officers were indicted by the U.S. Department of Justice. *See* https://www.justice.gov/opa/pr/four-charged-connection-multibillion-dollar-collapse-archegos-capital-management (last visited September 20, 2023).

business did not have any systemic problems and that there was little further exposure to family offices, stating: "I'm pleased with how the institution came together and responded to this very complex situation. . . . I think they [prime brokerage] did a really good job" and that "the context is the [prime brokerage] business is a phenomenal business that's been risk-managed well.  This was a very unusual incident.  I think the family office . . . I suspect it's less than 10% of the prime brokerage business."[3] *Id.*

24.     The Discovery Target also explained: "It was a family office actually, no outside money. It got to enormous size by their growth in their single-stock position – very concentrated single stock long positions that had explosive growth . . . We'll certainly be looking hard at family-office type relationships where they're very concentrated. . . . And frankly, the transparency and lack of disclosure relating to those institutions is just different from the hedge fund institutions."[4] *Id.*

25.     Accordingly, the Discovery Target and Morgan Stanley senior management directed the prime brokerage business (which sits within its Institutional Equities Division) to investigate and remove concentrated "family-office type" business. Decl. at ¶ 22. This directive was part of the reason that Morgan Stanley took an unusually hostile attitude to the Saxo Bank/Frasers position. *Id.* Although the employees in Europe initially attempted to hide the Applicant's position from senior management in New York, ultimately New York management was informed and decisions taken there. Decl. at ¶ 23.

26.     The documents and individuals relevant to Morgan Stanley's decision-making process in New York have not been made available as part of the discovery conducted so far in

---

[3]  *See* Morgan Stanley (MS) Q1 2021 Earnings Call Transcript | AlphaStreet (last visited September 20, 2023).
[4]  *See* Morgan Stanley (MS) Q1 2021 Earnings Call Transcript | AlphaStreet (last visited September 20, 2023).

the English Proceeding. Decl. at ¶¶ 27-29. Nonetheless, there is reason to believe that the matter was escalated to Discovery Target. The Discovery Target gave an interview to CNBC on June 14, 2021 (very shortly after Applicant had successfully enjoined Morgan Stanley from executing the Margin Call), in which he referred to the Archegos loss. Decl. at ¶ 24. He further explained how Morgan Stanley had "gone back and looked at all our margin exposures across prime brokerage" and that "we should never have been in this position in the first place and we've taken some lessons from it."[5] *Id.* Mr Gorman also noted "we've been very clear internally about the positions that we have the exposures we have and no I think nobody wants to be the next person [sic] walk into my office and tell me we've got a problem in that [prime brokerage] business. So, I think everybody understands exactly what are [sic] standards are."[6] *Id.*

27.    It is inconceivable that the Discovery Target was not briefed on the Margin Call and Passed-On Margin Call before this interview (which had presumably been fixed in his diary well in advance). Decl. at ¶ 25. Among other things, (i) Mr. Gorman had publicly expressed a personal interest in Morgan Stanley's review of its exposure to "family-office type" business post-Archegos, and he knew that CNBC would likely ask about it; (ii) Morgan Stanley considered Frasers a family office; (iii) Mr. Gorman had said the bank would look at all its margin exposures across prime brokerage; (iv) Morgan Stanley had somehow concluded that it had been exposed to an approximately US$1 billion risk as a result of Applicant's Boss position for several weeks and was prevented from curing it by the June 11 injunctions issued mere days before the CNBC interview; and (v) both the Archegos loss and the perceived exposure to Applicant's position were suffered by the same business unit (*i.e.*, Prime Brokerage). *Id.*

---

[5] *See* CNBC Exclusive: CNBC Transcript: Morgan Stanley Chairman & CEO James Gorman Speaks with CNBC's "Closing Bell" Today (last visited September 20, 2023).
[6] *See Id.*

28.     To date, Morgan Stanley has denied that the Discovery Target had any involvement in the matter and has not called him as a witness despite his plain importance to the English Proceeding. Decl. at ¶ 28. Yet, the Discovery Target's comments, which deal directly with Morgan Stanley's analysis of and lessons learned from its Archegos loss, were made both just before and just after the approximately US$1 billion Margin Call on Saxo Bank (which was passed on to Applicant) and implied a direct connection to the bank's new policies in response to the Archegos collapse. *Id.*

29.     The requested discovery—which is related to a very narrow time period and related to very specific topic preceding Mr. Gorman's comments—is necessary and relevant to the claims in the English Proceeding because Mr. Gorman's comments suggest that either (1) he had not been briefed on the Margin Call and related events (which would be concerning, given the size of the Margin Call, the fact that it represented a second significant prime brokerage risk management issue in weeks of the Archegos event, and the assurances Mr. Gorman was giving the market about the adequacy of risk management by the prime brokerage business), or (2) he had been briefed and made the comments anyway, arguably misleading the markets as to Morgan Stanley's exposure. Decl. at ¶ 29. In addition (and as explained further below), the discovery sought is necessary to understand the extent to which the decisions to impose and maintain the Margin Call were driven (either directly or indirectly) by Mr. Gorman. *Id.* For example, any briefing materials sent to Mr Gorman prior to his CNBC interview, and any ensuing communications, are likely to contain information highly relevant to the claims in the English Proceeding, including Morgan Stanley's conduct and motivations in making and maintaining the Margin Call. *Id.*

**Nature of the Evidence Sought in this District**

30.    The evidence sought through the Application is relevant and probative and will be used to support the allegations made in the English Proceeding.

31.    More specifically, the documents and testimony from Mr. Gorman are likely to reveal the extent of his knowledge of the Margin Call and Passed-On Margin Call during the relevant period and his involvement (whether direct or indirect) in the decision(s) to impose and maintain them.

32.    A key issue in the English Proceeding is the state of Morgan Stanley's knowledge and intentions at the time of the decision to impose the Margin Call on 25 May 2021 and in the following days when Morgan Stanley maintained the Margin Call despite Frasers' offer to (*inter alia*) pledge the Custody Shares to remove the supposed credit risk exposure). To better understand this issue, Frasers served a Request for Further Information on Morgan Stanley in 2021 (the "RFI") seeking, *inter alia*, confirmation of the identity of the individuals who made the relevant decision(s).   Morgan Stanley responded to the RFI on 7 January 2022 (its response being a Statement of Case in the English Proceeding) and relevantly asserted that (a) the decision to impose the Margin Call was made on 25 May 2021 by two individuals in Morgan Stanley's 'Business Unit Risk' division, (b) there was no further decision to maintain the Margin Call, and (c) the decision was not guided or restricted by any (policy or procedure) documentation.

33.    Not least in the apparent absence of any written policy and procedure framework to govern margin requirements and the making and maintenance of margin calls, Frasers is concerned that Morgan Stanley's decisions to make and maintain the Margin Call were at least partly guided by irrational considerations arising either directly from Mr. Gorman, or from concern within the bank's relevant business and risk management teams about the likely reaction

of those at the top of the organization (in particular Mr. Gorman), to the knowledge that weeks after the massive losses incurred in the collapse of Archegos, the bank's prime brokerage business had again allowed what the bank perceived to be a large single-stock risk exposure to be built up by what the bank mistakenly viewed as a family office. The evidence sought by the Application from Mr. Gorman is probative of this issue.

34.    Mr. Gorman, the individual from whom discovery is sought is not currently, and is not expected to be, a party to, or participant in, the English Proceeding. Indeed, absent the Application, the evidence sought herein from Mr. Gorman individually would almost certainly remain outside the reach of the English High Court.

35.    Upon information and belief, Mr. Gorman owns multiple residences in the Southern District of New York, including a residence at 40 Bond Street, Apt. 5A, New York, NY 10012, and is believed to maintain his primary office in this Southern District of New York.

36.    There is no indication the civil courts of England and Wales, including the High Court hearing the English Proceeding, would not be receptive to the evidence sought through the Application through this Court's judicial assistance. To the contrary, English courts and the High Court hearing the English Proceeding would be receptive to evidence that would aid in furthering the resolution of the English Proceeding through discovery of relevant facts.

37.    The evidence sought through the Application does not circumvent any proof-gathering restriction under English law.

38.    Finally, the evidence sought from Mr. Gorman is not intrusive or unduly burdensome as it is limited to documents and testimony concerning his knowledge of a single issue within a limited period (*i.e.*, March 25, 2021, when Archegos collapsed and June 30, 2021,

shortly after he made the public comments to CNBC referred to above concerning Morgan Stanley's prime brokerage business and its exposure to Archegos-like risks).

39.     As described above, this request for judicial assistance aims to be narrowly focused given the facts at issue in the English Proceeding. This is the type of evidence regularly sought under the rules and practice of the United States District Courts from individual witnesses.

## ARGUMENT

### I.    Standard for Granting Relief

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  Section 1782 "provide[s] for assistance in obtaining documentary and other tangible evidence as well as testimony." *Id.* at 248.  The statute reads, in pertinent part:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure. A person may not be

compelled to give his testimony or statement or to produce a
document or other thing in violation of any legally applicable
privilege.

28 U.S.C. § 1782(a) (2016).

Courts have distilled § 1782's language into a two-part inquiry – whether a district court
is *authorized* to grant relief and whether it *should* grant relief in its broad discretion. First, a
district court is authorized to grant a § 1782 request where: (1) the person from whom discovery
is sought resides (or is found) in the district of the district court to which the application is made,
(2) the discovery is for use in a proceeding before a foreign or international tribunal, and (3) the
application is made by a foreign or international tribunal or any interested person. 28 U.S.C. §
1782(a); *see also Symeou v. Hornbeam Corp. (In re Hornbeam Corp.)*, 722 F. App'x 7 (2d Cir.
2018); *see also Mees v. Buiter,* 793 F.3d 291 (2d Cir. 2015) citing *Brandi-Dohrn v. IKB
Deutsche Industriebank AG*, 673 F.3d 76 (2d Cir. 2012).[7]

Next, once a district court has determined that it is authorized to grant relief, it is free to
grant relief in its broad discretion. The court's discretion is guided by the discretionary factors
recited by the Supreme Court in *Intel*:

(1) whether "the person from whom discovery is sought is a

---

[7]     Courts in the Second Circuit routinely handle §1782 requests on an *ex parte* basis. *In re
Hornbeam Corp.*, 2015 U.S. Dist. LEXIS 142361 (S.D.N.Y. 2015), *aff'd, Symeou v. Hornbeam
Corp. (In re Hornbeam Corp.)*, 722 F. App'x 7 (2d Cir. 2018) (collecting cases, and noting that
"[d]istrict courts may and customarily do resolve applications for discovery pursuant to § 1782
through *ex parte* proceedings" and that there is a "widespread recognition that § 1782
applications are properly handled *ex parte*"); *see also In re O'Keeffe,* 650 F. App'x 83, 85 (2d
Cir. 2016), quoting *Gushlak v. Gushlak,* 486 F. App'x 215 (2d Cir. 2012) ("[I]t is neither
uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex
parte*.") The respondent's due process rights are not violated because he can later challenge any
discovery request by moving to quash [a subpoena] pursuant to Federal Rule of Civil Procedure
45(c)(3).") (citing *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 78 (2d Cir.
2012); *In re Edelman*, 295 F.3d 171, 173-75 (2d Cir. 2002); *In re Clerici*, 481 F.3d 1324 (11th
Cir. 2007) (affirming denial of motion to vacate order granting *ex parte* § 1782 application)).

-13-

participant in the foreign proceeding," because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach" and therefore their evidence may be "unobtainable absent § 1782(a) aid";

(2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

(3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(4) whether the § 1782(a) request is "unduly intrusive or burdensome."

*Intel*, 542 U.S. at 264-65. This discretion is further informed by the twin Congressional aims of § 1782, "which are to provide efficient means of assistance to participants in international litigation in our federal courts and to encourage foreign countries by example to provide similar means of assistance to our courts." *In re Servicio Pan Americano de Proteccion,* 354 F. Supp. 2d 269, 273 (S.D.N.Y. 2004); *see also Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24 (2d Cir. 1998)).

As demonstrated below, Applicant satisfies the statutory requirements and the discretionary factors militate in favor of granting judicial assistance, and, thus, this Court should grant the relief sought in the Application.

## II.     The Applicant Meets the Mandatory Requirements for Granting Relief.

### A.     The Discovery Target Resides or is Found in This District.

As explained above, the Discovery Target "resides or is found in" the Southern District of New York. Decl. at ¶ 35. On information and belief, the Discovery Target lives in Manhattan. *Id.* The Discovery Target is CEO and Chairman of Morgan Stanley, which maintains its head office in Midtown, Manhattan. Decl. at ¶ 9.

-14-

**B.**   **The Discovery Sought is for Use in a Proceeding in a Foreign Tribunal.**

Applicant satisfies the second requirement because the discovery sought through the instant Application is for use in the pending English Proceeding. Decl. at ¶ 7. Specifically, Applicant intends to use the requested discovery from the Discovery Target to probe Morgan Stanley's motivation for the Margin Call, specifically: whether Morgan Stanley acted irrationally in response to the Archegos debacle, whether senior corporate officers in New York were informed and involved, and which officers they were, and what directives they issued in relation to family offices, risk management in the prime brokerage business, the Margin Call and subsequent negotiations with the Applicant. Decl. at ¶¶ 7, 27.

**C.**   **The Applicant is an Interested Person.**

A person who has "participation rights" and "possesses a reasonable interest in obtaining judicial assistance… qualifies as an interested person within any fair construction of that term." *Intel*, 542 U.S. at 256-57 (2d Cir. 2004) (internal citations omitted). "The legislative history to § 1782 makes plain that 'interested person' includes a party to the foreign litigation." *See Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) (internal citations omitted). Here, the Applicant is an "interested person" because it is the claimant in the English Proceeding. Decl. at ¶ 3. Therefore, Applicant meets the third statutory requirement under 28 U.S.C. § 1782(a).

**III.**   **This Court Should Exercise its Discretion in Favor of Granting Relief.**

As noted above, once the District Court has determined that the mandatory requirements for relief under § 1782 are met, the Court is free to grant discovery in its discretion.  As set forth below, the discretionary factors identified by the Supreme Court in *Intel* weigh heavily in favor of granting the relief requested herein. *See Intel*, 542 U.S. at 264-65.

-15-

First, the Discovery Target is not a party to the English Proceeding, nor is Gorman expected to become a party to the English Proceeding. Decl. at ¶ 34. Additionally, Gorman is outside the jurisdiction of the English Court and has not been listed as a witness for the final hearing nor made available to Applicant by Morgan Stanley.  Decl. at ¶ 34. Accordingly, this factor weighs in favor of granting the Application. *See Intel*, 542 U.S. at 264 ("nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.").

Second, there is no indication that the English court would not be receptive to the documentary or testimonial evidence sought through the instant Application. Decl. at ¶ 36; *see also In re Eurasian Bank Joint Stock Co.*, 2015 WL 6438256 at *3 (N.D. Tex. Oct. 21, 2015) (stating that "[i]n the absence of authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782, which Eurasian's local counsel has represented to the Court that he has been unable to find, the Court determines that the second factor does not weigh against an exercise of discretion in Eurasian's favor."); *see also Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995) ("[A] district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782.").  In fact, the sought evidence would be welcome under English law and procedure. *Id.*.

Third, under English law, the evidence sought through the instant Application would likely be admissible and does not otherwise circumvent any proof-gathering restrictions under the applicable rules or law in England. Decl. at ¶ 37.

Fourth and finally, this Application is not unduly intrusive or burdensome as the Applicant proposes to serve a targeted request for documents upon the Discovery Target as set

forth in the attached proposed subpoena, which is attached as **Exhibit 1** for this Court's review. *See also* Decl. at ¶ 38. The proposed subpoena also requests a deposition of the Discovery Target to focus on the same narrow time frame and issues.  The Applicant submits that the foregoing requests—for documents and a deposition—are consistent with the type of documentary and testimonial evidence individuals typically produce and give in the normal course of litigation. Decl. at ¶ 38; Ex. 1, Proposed Subpoena.

As such, each discretionary factor identified by the *Intel* Court weighs in favor of granting the Application.

WHEREFORE, Applicants respectfully request that this Court enter an Order substantially in the form attached hereto as **Exhibit 2**:

    (a)    exercising its discretion, pursuant to 28 U.S.C. § 1782, and granting this Application for Judicial Assistance;

    (b)    granting Applicant leave to conduct discovery pursuant to the Federal Rules of Civil Procedure, including, but not limited to, leave to serve the subpoena, in substantially the same form as the proposed subpoena attached as Exhibit 1 to this Application;

    (c)    reserving jurisdiction to grant Applicant leave to serve follow-up subpoenas on any other person or entity as may be necessary to obtain the evidence described in the Application; and

    (d)    granting any other relief that this Court deems just and proper.

Dated: September 20, 2023

Respectfully submitted,


*/s/ Thomas Vandenabeele, Esq.*
Thomas Vandenabeele, Esq.
KELLNER HERLIHY GETTY & FRIEDMAN LLP
470 Park Avenue South – 7th Floor
New York, NY 10016-6819
Telephone: 212-889-2121
Email: tv@khgflaw.com

And


SEQUOR LAW, P.A.
1111 Brickell Ave. Suite 1250
Miami, Florida 33131
Telephone:  305-372-8282
Facsimile:  305-372-8202

*/s/ Joseph Rome., Esq.*
Joseph Rome Esq.
jrome@sequorlaw.com
@sequorlaw.com

*Attorneys for Applicant, Frasers Group PLC*